Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Frank P. Tiscione, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company,
Liberty Mutual Fire Insurance Company, Liberty Insurance
Corporation, The First Liberty Insurance Corporation, LM
Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance
Company, Liberty County Mutual Insurance Company, LM
Property and Casualty Insurance Company, Safeco Company
of Indiana, and American States Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
LIBERTY MUTUAL INSURANCE COMPANY,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY INSURANCE CORPORATION,                                    Docket No.:
THE FIRST LIBERTY INSURANCE CORPORATION,
LM INSURANCE CORPORATION,
LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY,
LIBERTY COUNTY MUTUAL INSURANCE COMPANY,
LM PROPERTY and CASUALTY INSURANCE COMPANY,
SAFECO COMPANY OF INDIANA, and
AMERICAN STATES INSURANCE COMPANY,

                                        Plaintiffs,

                   -against-

VKA MEDICAL SUPPLY CORP., VITA MEDICAL SUPPLY
CORP., ANTON SEMENOV, PRYM MED SUPPLY CORP., and
ILYA VARSHAVSKIY,

                                        Defendants.
-------------------------------------------------------------------------------X

## **COMPLAINT**

        Plaintiffs, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company,

Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance

Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively "Liberty Mutual" or "Plaintiffs"), as and for their Complaint against defendants VKA Medical Supply Corp., Vita Medical Supply Corp., Anton Semenov, PRYM MED Supply Corp., and Ilya Varshavskiy (collectively, the "Defendants"), hereby allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action seeks to recover the monies that Defendants wrongfully obtained from Liberty Mutual, and expunge the pending fraudulent billing submitted by Defendants, relating to medically unnecessary, illusory, and otherwise unreimbursable durable medical equipment ("DME") in the form of purported Electrical Osteogenesis Stimulators (a/k/a bone growth stimulation devices) and associated medical tape (collectively, the "Fraudulent Equipment") allegedly dispensed by VKA Medical Supply Corp. ("VKA"), Vita Medical Supply Corp. ("Vita"), and PRYM MED Supply Corp. ("PRYM") (collectively, the "DME Providers"). The DME Providers purportedly dispensed the Fraudulent Equipment to New York automobile accident victims insured by Liberty Mutual ("Insureds"), without regard for whether the Insureds had any need whatsoever for an osteogenesis stimulator.

2.      The DME Providers are owned and controlled by Anton Semenov ("Semenov") and Ilya Varshavskiy ("Varshavskiy") (collectively, the "Provider Owners"). The Provider Owners devised an integrated scheme to exploit New York's No-Fault insurance system by targeting the prescription and dispensing of purported Electrical Osteogenesis Stimulators because they could bill Liberty Mutual and other New York automobile insurance companies $3,300.00 for each patient who received one of the devices. In furtherance of the scheme, the Defendants colluded

with the operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "No-Fault Clinics) and various physicians and other healthcare providers (the "Prescribing Practitioners") that prescribed DME to the Insureds treating at the clinics, to steer prescriptions for the Fraudulent Equipment to the DME Providers, to the extent actual prescriptions were even issued.

3.      As part of the scheme, the Defendants intentionally utilized unauthorized, forged, and illegally duplicated prescriptions to claim entitlement to inflated fees to which they were never entitled.  Indeed, one of the physicians who allegedly authorized numerous prescriptions for Electrical Osteogenesis Stimulators dispensed by the DME Providers affirmed in an affidavit that she never prescribed any such device and did not even know what the device was used for. Moreover, to the extent the DME Providers actually dispensed the Fraudulent Equipment, the Defendants knew that the devices were not medically necessary, knew that the Insureds had absolutely no need for the devices as they generally sustained only soft tissue injuries, and knew that the prescribing and dispensing of the devices was done solely to steal monies from insurance companies.

4.      By this action, Liberty Mutual seeks to recover more than $120,086.00 that has been wrongfully obtained by the Defendants, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $553,337.00 in pending no-fault insurance claims that have been submitted through the DME Providers, because:

(i)      Defendants billed Liberty Mutual for the Fraudulent Equipment that was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     Defendants billed for the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback and financial arrangements;

(iii)   Defendants, in many instances, billed Liberty Mutual for the Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and

(iv)   to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by the Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided as the Healthcare Common Procedure Coding System Codes identified in the bills did not accurately represent what was provided to Insureds.

5.   The Defendants fall into the following categories:

(i)   the DME Providers are New York corporations that purported to dispense the Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and billed New York automobile insurance companies, including Liberty Mutual; and

(ii)   the Provider Owners are the individuals who own and control the DME Providers, including Semenov, who is the listed owner of VKA and Vita, and Varshavskiy, who is the listed owner of PRYM.  The Provider Owners used the DME Providers as part of an integrated scheme to submit bills to Liberty Mutual and other New York automobile insurance companies for purportedly dispensing the Fraudulent Equipment to automobile accident victims.

6.   As discussed below, the Defendants at all times have known that the claims for Fraudulent Equipment submitted to Liberty Mutual by the DME Providers were fraudulent because: (i) the Defendants billed Liberty Mutual for Fraudulent Equipment that was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants billed for the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback and financial arrangements; (iii) the Defendants, in many instances, billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and (iv) to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by the Defendants fraudulently mispresented the type and nature of

the Fraudulent Equipment as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for their claims for the Fraudulent Equipment.

8.      The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted, or caused to be submitted, to Liberty Mutual by the Defendants under the names of VKA, Vita, and PRYM.

9.      The Defendants' fraudulent scheme against Liberty Mutual and the New York automobile insurance industry, which began in or about November 2021, continues uninterrupted through the present day in that the Defendants continue to attempt collection on the bills for the Fraudulent Equipment.

**THE PARTIES**

I.      **Plaintiffs**

10.      Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal place of business in Boston, Massachusetts.  Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

11.      Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are Illinois corporations with their principal place of business in Boston, Massachusetts.  Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

12.     Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts.  Liberty Mutual Fire Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

13.     Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts.  Liberty County Mutual Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

14.     Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are Indiana corporations with their principal place of business in Boston, Massachusetts.  LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.     **Defendants**

15.     Defendant VKA is a New York corporation with its principal place of business in Brooklyn, New York. VKA was incorporated on November 29, 2021, is owned by Semenov and has been used by the Defendants as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

16.     Defendant Vita is a New York corporation with its principal place of business in Brooklyn, New York. Vita was incorporated on January 20, 2022, is owned by Semenov and has been used by the Defendants as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers

17.     Defendant Semenov resides in and is a citizen of New York. Semenov is not and has never been a licensed healthcare provider.

18.     Defendant PRYM is a New York corporation with its principal place of business in Brooklyn, New York. Vita was incorporated on May 12, 2022, is owned by Varshavskiy and has been used by the Defendants as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

19.     Defendant Varshavskiy resides in and is a citizen of New York. Varshavskiy is not and has never been a licensed healthcare provider.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

21.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

22.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

24.     Liberty Mutual underwrites automobile insurance in New York.

## I.      An Overview of the Pertinent Laws

### A.  Pertinent Laws Governing No-Fault Insurance Reimbursement

25.      New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

26.      Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

27.      In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

28.      In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

29.      Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

30.      For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

31.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.  In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

32.     New York law prohibits licensed healthcare service providers from paying or accepting kickbacks in exchange for referrals for DME. See, e.g., N.Y. Educ. Law §§ 6509-a; 6530(18); 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

33.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509(10), 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

34.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

35.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

36.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to Liberty Mutual, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

37.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to Liberty Mutual, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME**

38.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

39.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats,

transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, and devices to prevent deep vein thrombosis.

40.    To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

41.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

42.    As it relates to DME, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)    The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

43.     As indicated by the New York Fee Schedule, payment for DME is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

44.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

45.     For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

46.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.  Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

47.     Where a specific DME does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as Liberty Mutual to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

48.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault

reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

49.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

> (i)     the provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;
>
> (ii)    the prescription for DME is not based on any unlawful financial arrangement;
>
> (iii)   the DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s); and
>
> (iv)    the fee sought for DME provided to an Insured was not in excess of the price contained in the Medicaid Fee Schedule or the standard use for a Non-Fee schedule item.

## II.     **Defendants' Fraudulent Scheme**

### A.      **Overview of the Scheme**

50.     Beginning in or about November 2021, and continuing uninterrupted through the present day, the Defendants masterminded and implemented an egregious, integrated fraudulent scheme in which they used the DME Providers to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges – which they were not eligible to receive – for the Fraudulent Equipment purportedly dispensed to the Insureds.

51.     The DME Providers (VKA, Vita, and PRYM) purported to be separate, legitimate medical supply companies operating in Brooklyn, New York, when, in fact, they were used by the

Defendants as part of a large-scale fraudulent scheme that exploited Liberty Mutual Insureds, as well as insureds of other New York automobile insurers, through the dispensing of Electrical Osteogenesis Stimulators (i.e., the Fraudulent Equipment) to patients at various multi-disciplinary medical clinics that primarily treat patients with No-fault insurance (the "No-Fault Clinics").

52.     The Defendants billed Liberty Mutual more than $689,000.00 for the Fraudulent Equipment. Notwithstanding the submission of billing under three different DME supply company names, the DME Providers operated as part of the same fraudulent scheme, operating in the same manner, singularly dispensing the same Fraudulent Equipment, using identical pre-printed prescription forms from many of the same Prescribing Practitioners, submitting the exact same charges on every single bill for the exact same equipment (Electrical Osteogenesis Stimulators and associated waterproof/medical tape), using the same font and format on billing submissions to Liberty Mutual, using the same delivery receipts, and using similar @gmail.com email addresses.

53.     The DME Providers further operated in the same manner as they each lacked any accessible retail location, and operated without advertising or marketing to the general public or without making any legitimate efforts to attract patients or customers who might need DME. For example, Vita's office address is actually an auto repair shop.

54.     Similarly, the DME Owners did virtually nothing that would be expected of the owners of legitimate DME supply companies to develop their reputation and attract patients and customers.

55.     The Defendants, instead, entered into illegal, collusive agreements with the Clinic Controllers and the Prescribing Practitioners working at the No-Fault Clinics and steered them to prescribe and direct large volumes of prescriptions (or purported prescriptions) to the DME

Providers for the specifically targeted Fraudulent Equipment, which equipment was purportedly prescribed and dispensed to treat patients at the No-Fault Clinics.

56.     Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, the DME Providers intentionally focused on and targeted one specific item of DME -- an Electrical Osteogenesis Stimulator -- which is also known as a bone growth stimulation device.  Electrical Osteogenesis Stimulators, in fact, were the only item of DME (along with associated waterproof/medical tape) that the DME Providers dispensed.

57.     The Defendants chose the Fraudulent Equipment because they could acquire cheap, portable stimulation devices at low cost and submit false claims for reimbursement to Liberty Mutual misrepresenting that an expensive Electrical Osteogenesis Stimulator with a reimbursable charge of $3,300.00 under HCPCS Code E0747 was dispensed to the Insureds.

58.     The Fraudulent Equipment billed by the DME Providers was not medically necessary and was provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

59.     As discussed in more detail below, osteogenesis stimulators are devices used to encourage bone growth and help heal broken bones.  Various commercial insurers have issued policy bulletins that make clear that the use of an osteogenesis stimulator is only necessary to heal bone fractures under limited circumstances, while CMS has published guidance stating that electrical osteogenesis stimulators billed under E0747 are covered only if there is evidence of a fracture where healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator.

60.     Notwithstanding the limited, accepted uses for osteogenesis stimulators, the Defendants repeatedly purported to dispense expensive Electrical Osteogenesis Stimulators, with a reimbursable charge of $3,300.00 per device, to numerous Insureds who suffered no bone fractures solely to maximize profits without regard to genuine patient care.

61.     By submitting bills to Liberty Mutual seeking No-Fault Benefits for the Fraudulent Equipment, seeking reimbursement under HCPCS Code E0747, the Defendants represented that they provided Insureds with an Electrical Osteogenesis Stimulator that was medically necessary, as determined by a healthcare provider licensed to prescribe DME.

62.     In keeping with the fact that the Fraudulent Equipment was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, none of the Insureds suffered fractures or had any need for bone healing or repair.

63.     In addition, many charges submitted by the DME Providers to Liberty Mutual were based upon prescriptions purportedly issued by the Prescribing Practitioners and submitted to Liberty Mutual by the Defendants that were forged or contained unauthorized, copied signatures on pre-printed forms.  In other instances, the Defendants submitted bills under the names of the DME Providers for the Fraudulent Equipment even though no licensed practitioner issued a prescription or referral for the device.

64.     The prescriptions obtained by the DME Providers that were generated at the No-Fault Clinics were pre-printed prescription forms that were never given to the Insureds, but as part of the scheme, they were routed directly to the DME Providers from the No-Fault Clinics to ensure that the Insureds did not try to fill the prescriptions with legitimate DME retailers.

65.     The pre-printed prescription forms utilized by each of the DME Providers to dispense and bill for the expensive Electrical Osteogenesis Stimulators were identical, using the

exact same format, exact same print font, and exact same language to prescribe a "Wearable PEMF Device" with the only change being the particular name of the DME Provider in the header of the prescription.

66.     Similarly, each of the DME Providers utilized an identical pre-printed "Delivery Receipt" allegedly signed by the patient and the Provider Owners, using the exact same format, exact same print font, and exact same language to purport to demonstrate that a "wearable PEMF Device" and "(10) adhesives (Kinesiology tape)" were delivered to the Insured, with the only change being the particular name of the DME Provider in the header of the delivery receipt.

67.     In furtherance of the integrated scheme, the Defendants utilized the pre-printed prescription forms and pre-printed delivery receipts to justify each of the DME Providers' billing for the Electrical Osteogenesis Stimulators and associated waterproof medical tape, typically as follows:

| Description of Treatment | Fee Schedule Treatment Code | Charges |
|---|---|---|
| Elect Osteogenesis Stimulator | E0747 | $3,300.00 |
| Waterproof tape | A4452 | $1.10 |

68.     In keeping with the integrated nature of the scheme among VKA, Vita, and PRYM, as well as the prescribing and dispensing of the Electrical Osteogenesis Stimulators in predetermined fashion to exploit the patients for financial gain, in multiple instances Vita and PRYM purported to dispense identical Electrical Osteogenesis Stimulators *to the same patient* and each, thereafter, billed Liberty Mutual $3,300.00 under HCPCS Code E0747.

**B.     The Illegal Kickback and Referral Relationships with the Clinics**

69.     Though ostensibly organized to provide a range of healthcare services to Insureds

at a single location, the No-Fault Clinics form where the Defendants generated the prescription and referrals for the Fraudulent Equipment, in actuality, were organized to supply "one-stop" shops for No-Fault insurance fraud.

70.     Further, many of the No-Fault Clinics operate under the unlawful ownership and control of unlicensed laypersons and are actually nothing more than multidisciplinary medical mills organized to be convenient one-stop shops for No-Fault insurance fraud.

71.     In fact, many of the purported prescriptions for the Fraudulent Equipment steered to VKA and Vita were from No-Fault Clinics where the Prescribing Practitioners were associated with a professional corporation named Metro Pain Specialists P.C. ("Metro Pain").  Metro Pain has been named as a defendant in recent affirmative fraud cases involving fraudulent services billed to No-fault insurers, including State Farm Mut. Ins. Co. v. Metro Pain Specialists, P.C., et al., 21-cv-05523 (E.D.N.Y. 10/5/2021) and Allstate Ins. Co. v. Metro Pain Specialists P.C., et al., 21-cv-05586-DG-RER (E.D.N.Y. 10/7/2021).

72.     Notably, Dr. Patricia Kelly, D.O., a physician formerly employed by Metro Pain and its successor company, Tri-Borough Medical Practice P.C. ("Tri-Borough"), and who allegedly authorized numerous prescriptions for Electrical Osteogenesis Stimulators submitted by VKA and Vita in support of their claims, has affirmed that, among other things, (i) she never prescribed any Electrical Osteogenesis Stimulators and virtually never prescribed any DME aside from a brace on very rare occasions; (ii) she does not even know what an Electrical Osteogenesis Stimulator is or what it is used for; (iii) the primary No-Fault Clinic location where she worked was controlled by laypersons; and (iv) the testing, treatment, DME and prescriptions issued at the Metro Pain/Tri-Borough practice were part of a protocol to increase the medical billing to the patient's insurance company.

73.     Similarly, a nurse practitioner who worked for Tri-Borough advised Liberty Mutual that (i) a prescription used by PRYM to dispense an Electrical Osteogenesis Stimulator was not authorized by her and (ii) she believed that PRYM was owned by the same person as Vita.

74.     The No-Fault Clinics that steered prescriptions for the Fraudulent Equipment to the DME Providers including, among others, the following:

(i)     60 Belmont Avenue, Brooklyn;

(ii)    1975 Linden Boulevard, Elmont;

(iii)   146 Empire Boulevard, Brooklyn;

(iv)    82-17 Woodhaven Boulevard, Ridgewood;

(v)     160-59 Rockaway Boulevard, Jamaica,

(vi)    243-51 Merrick Boulevard, Rosedale;

(vii)   2558 Holland Avenue, Bronx; and

(viii)  3209 Fulton Street, Brooklyn.

75.     Liberty Mutual has received billing from many of the No-Fault Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

76.     The Defendants entered into collusive arrangements with the Clinic Controllers and the Prescribing Practitioners at the No-Fault Clinics in order to obtain access to Insureds, so that the Defendants could implement and execute their fraudulent scheme and maximize the amount of PIP Benefits the Defendants could obtain from Liberty Mutual and other New York automobile

insurers. As part of the collusive arrangements, the Defendants steered the Clinic Controllers and the Prescribing Practitioners to direct prescriptions (or purported prescriptions) for the Fraudulent Equipment to the DME Providers in exchange for kickbacks or other financial consideration.

77.     In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the DME Defendants and the Clinic Controllers, the prescriptions for Fraudulent Equipment were not medically necessary and were provided, to the extent provided at all, pursuant to predetermined treatment protocols, as further explained below.

78.     In further keeping with the fact that the prescriptions for the Fraudulent Equipment were the result of unlawful financial arrangements between the DME Defendants and the Clinic Controllers, the prescriptions for Fraudulent Equipment were forged, unauthorized, or illegally duplicated prescriptions in many instances.

79.     As a result of the unlawful financial arrangements, the DME Providers obtained large volumes of prescriptions (or purported prescriptions) and large volumes of Insureds' identifying information that enabled them to bill hundreds of thousands of dollars to Liberty Mutual, alone, for a single device, over only a few short months, without operating any accessible retail locations, without any legitimate marketing or advertising, and without offering or selling a variety of DME products beyond the Fraudulent Equipment.

80.     But for the payment of kickbacks from the DME Defendants, the Clinic Controllers, working with the Prescribing Practitioners, would not have had any reason to: (i) direct a substantial volume of medically unnecessary prescriptions to the DME Providers; (ii) make the Insureds' information available to the DME Providers; and/or (iii) provide the DME Providers with forged, unauthorized, or illegally duplicated prescriptions in many instances.

81.     Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued, but the Defendants and the Clinic Controllers  affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

82.     As a result of the unlawful financial arrangements, the Defendants quickly billed hundreds of thousands of dollars to Liberty Mutual, and likely millions of dollars to other New York automobile insurers, for the Fraudulent Equipment over a short period of time.

**C.     The Fraudulent Equipment was Prescribed Pursuant to Fraudulent Protocols In Order to Exploit Patients for Financial Gain**

83.     In addition to the unlawful financial arrangements between the Defendants and the Clinic Controllers, the prescriptions (or purported prescriptions) that were provided to the Defendants were the result of predetermined fraudulent protocols between and among the DME Defendants, the Clinic Controllers and the Prescribing Practitioners implemented solely to maximize the billing that the DME Defendants could submit to insurers, including Liberty Mutual, rather than to treat or otherwise benefit the Insureds.

84.     The Defendants' billing for the Fraudulent Equipment always included a charge of $3,300.00 under HCPCS Code E0747, for an Electrical Osteogenesis Stimulator (non-spinal), and a charge of $1.10 under HCPCS Code A4452, for waterproof tape.

85.     Osteogenesis stimulators are devices used to encourage bone growth and accelerate fracture healing.  The Centers for Medicare & Medicaid Services ("CMS") has published guidance making clear that the devices are medically necessary only in limited instances involving bone fractures.  In particular, CMS states as follows:

> A non-spinal electrical osteogenesis stimulator (E0747) is covered only if any of the following criteria are met:

1. Nonunion of a long bone fracture (see Appendices section) defined as radiographic evidence that fracture healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator, or

2. Failed fusion of a joint other than in the spine where a minimum of nine months has elapsed since the last surgery, or

3. Congenital pseudarthrosis.

Nonunion of a long bone fracture must be documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days, each including multiple views of the fracture site, and with a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs.

A non-spinal electrical osteogenesis stimulator will be denied as not medically necessary if none of the criteria above are met.

See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33796.

86. Upon information and belief, in the claims identified in Exhibit "1", substantially all of the Insureds whom the Defendants purported to provide Fraudulent Equipment for were involved in relatively minor and low-impact "fender-bender" accidents, to the extent they were involved in any actual accidents at all.

87. In fact, none of the Insureds identified in Exhibit "1" whom the DME Defendants purported to provide the Fraudulent Equipment to suffered any bone fractures or sustained any significant injuries or health problems as a result of the relatively minor accidents they experienced, or purported to experience, that required the use of an Electrical Osteogenesis Stimulator.

88. In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent they had any injuries at all – and had no reason to be prescribed an Electrical Osteogenesis Stimulator, virtually all of the Insureds identified on Exhibit "1" sustained soft tissue injuries, such as sprains and strains.

89.     Contrary to the limited instances where an Electrical Osteogenesis Stimulator might be medically necessary, and in support of the fact that the prescriptions used by the DME Providers were the result of predetermined fraudulent protocols, these devices were prescribed to Insureds within days of their accidents.  For example:

(i)     On February 5, 2022, an Insured name RF was purportedly involved in an automobile accident. Thereafter, RF presented to a Clinic located at 2588 Holland Ave., Bronx, New York (the "Holland Ave. Clinic").  Following an examination with Julie Saint Jean, F.N.P. ("Saint Jean") on February 10, 2022, Saint Jean purportedly issued a prescription, that was provided to VKA, for the Fraudulent Equipment - only five days after RF's accident - and despite RF not being diagnosed by Saint Jean as having any bone fractures;

(ii)    On February 13, 2022, an Insured name WL was purportedly involved in an automobile accident. Thereafter, WL presented to a Clinic located at 160-59 Rockaway Blvd, Jamaica, New York.  After an examination with Patricia Kelly, D.O. ("Kelly") on February 28, 2022, Kelly purportedly issued a prescription, that was provided to VKA, for the Fraudulent Equipment - only 15 days after WL's accident -  and despite WL not being diagnosed by Kelly as having any bone fractures;

(iii)   On February 18, 2022, an Insured name CL was purportedly involved in an automobile accident. Thereafter, CL presented to a Clinic located at 3209 Fulton St., Brooklyn, New York (the "Fulton St. Clinic").  After an examination with Patricia Kelly, D.O. on February 23, 2022, Kelly purportedly issued a prescription, that was provided to VKA, for the Fraudulent Equipment - only five days after CL's accident -  and despite CL not being diagnosed by Kelly as having any bone fractures;

(iv)    On March 3, 2022, an Insured name SJ was purportedly involved in an automobile accident. Thereafter, SL presented to a Clinic located at 60 Belmont Ave., Brooklyn, New York (the "Belmont Ave. Clinic").  After an examination with Gaetan Jean Marie, F.N.P. ("Jean Marie") on March 8, 2022, Jean Marie purportedly issued a prescription, that was provided to Vita, for the Fraudulent Equipment - only five days after SJ's accident - and despite SJ not being diagnosed by Jean Marie as having any bone fractures;

(v)     On April 28, 2022, an Insured name JC was purportedly involved in an automobile accident. Thereafter, JC presented to the Holland Ave. Clinic. After an examination with Inna Levtsenko, N.P. ("Levtsenko") on May 3, 2022, Levtsenko purportedly issued a prescription, that was provided to

Vita, for the Fraudulent Equipment - only five days after JC's accident - and despite JC not being diagnosed by Levtsenko as having any bone fractures;

(vi)     On May 18, 2022, an Insured name CA was purportedly involved in an automobile accident. Thereafter, CA presented to the Belmont Ave. Clinic. After an examination with Mishkina Terrane, N.P. ("Terrane") on May 25, 2022, Terrane purportedly issued a prescription, that was provided to Vita, for the Fraudulent Equipment - only seven days after CA's accident - and despite CA not being diagnosed by Terrane as having any bone fractures;

(vii)    On May 18, 2022, an Insured name TKG was purportedly involved in an automobile accident. Thereafter, TKG presented to the Belmont Ave. Clinic. After an examination with Mishkina Terrane, N.P. on May 25, 2022, Terrane purportedly issued a prescription, that was provided to Vita, for the Fraudulent Equipment - only seven days after TKG's accident - and despite TKG not being diagnosed by Terrane as having any bone fractures;

(viii)   On May 25, 2022, an Insured name PM was purportedly involved in an automobile accident. Thereafter, PM presented to the Fulton St. Clinic. After an examination with Inna Levtsenko, N.P. on June 1, 2022, Levtsenko purportedly issued a prescription, that was provided to PRYM, for the Fraudulent Equipment - only seven days after PM's accident - and despite PM not being diagnosed by Levtsenko as having any bone fractures;

(ix)     On May 25, 2022, an Insured name AT was purportedly involved in an automobile accident. Thereafter, AT presented to the Fulton St. Clinic. After an examination with Inna Levtsenko, N.P. on June 1, 2022, Levtsenko purportedly issued a prescription, that was provided to PRYM, for the Fraudulent Equipment - only seven days after AT's accident - and despite AT not being diagnosed by Levtsenko as having any bone fractures; and

(x)      On June 3, 2022, an Insured name TP was purportedly involved in an automobile accident. Thereafter, TP presented to a Clinic located at 1975 Linden Blvd, Elmont, New York.  After an examination with Phelan Clancy, N.P. ("Clancy") on June 6, 2022, Clancy purportedly issued a prescription, that was provided to PRYM, for the Fraudulent Equipment - only three days after TP's accident - and despite TP not being diagnosed by Clancy as having any bone fractures.

These are only representative examples.

90.     Despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent the Insureds were

actually injured at all –the Insureds identified in Exhibit "1" were all prescribed or referred the Fraudulent Equipment that was dispensed by the DME Providers.

91.     In keeping with the fact that the prescriptions were provided as part of a predetermined protocol to maximize profits – and not based on medical necessity – the DME Providers all billed for providing the Insureds identified in Exhibit "1", or purporting to provide them, with the same Fraudulent Equipment – i.e., an Electrical Osteogenesis Stimulator, billing Liberty Mutual $3,300.00 under HCPCS Code E0747, along with the associated tape.

92.     In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints would be evaluated, and the treating provider would direct a specific course of treatment based upon the patients' individual symptoms or presentation.

93.     Furthermore, in a legitimate setting, during the course of a patient's treatment, the provider may – but does not always – provide DME that would aid in the treatment of the patient's symptoms.  The specific DME that would be prescribed to aid the treatment of the patient would always directly relate to the patients' individual symptoms or presentation.

94.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

95.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

96.     It is extremely improbable that Insureds involved in different automobile accidents who treated at a specific No-Fault Clinic would routinely receive prescriptions for DME of substantially the same type.

97.     It is extremely improbable – to the point of impossibility – that Insureds involved in different automobile accidents who treated at a specific No-Fault Clinic would routinely receive prescriptions for the exact same Fraudulent Equipment (i.e., an Electrical Osteogenesis Stimulator).

98.     Even more, pursuant to the predetermined fraudulent protocols established to maximize profits, and without regard for genuine patient care, Insureds who treated at a specific No-Fault Clinic received multiple, nearly identical, prescriptions for DME, including for Fraudulent Equipment.

99.     By way of example, Insureds involved in different accidents who treated at the Belmont Ave. Clinic received multiple, nearly identical, prescriptions for DME, including prescriptions for Fraudulent Equipment that were routed to each of the DME Providers, regardless of the healthcare provider purportedly conducting the initial examination.  For example:

(i)     On December 16, 2021, an Insured named SR was purportedly involved in an automobile accident. Thereafter, SR presented to the Belmont Ave. Clinic.  After an initial examination with Gaetan Jean Marie, F.N.P. on December 21, 2021, Jean Marie purportedly issued two separate prescriptions for DME that were each provided to other DME suppliers; one prescription for: (i) a Positioning Cushion; (ii) a Lumber (sp) Sacral Support; (iii) a Bed Board; (iv) an Egg Crate Mattress; (v) a Cervical Collar; and (vi) a Cervical Pillow; and a second prescription for the 6-week rental of a Sustained Acoustic Medicine ("SAM") Unit and Coupling Patches.  On February 3, 2022, Jean Marie purportedly issued a prescription for Fraudulent Equipment that was provided to VKA, despite Jean Marie not performing a follow-up examination or any other service on SR on that day, and despite Jean Marie not diagnosing SR as having any bone fractures.  On February 10, 2022, Jean Marie purportedly issued two separate prescriptions to SR that were provided to other DME suppliers; one prescription for: (i) a K.O. Custom Fitted; and another prescription for (ii) a Shoulder Support Custom Fitted (left), despite Jean Marie not performing a follow-up examination or any other service on SR on that day;

(ii)    On February 17, 2022, an Insured named TC was purportedly involved in an automobile accident. Thereafter, TC presented to the Belmont Ave. Clinic.  After an initial examination with Patricia Kelly, D.O. on February

24, 2022, Kelly purportedly issued four separate prescriptions for DME that were each provided to different DME suppliers; a prescription for Fraudulent Equipment that was provided to VKA, despite Kelly not diagnosing TC as having any bone fractures; a prescription for: (i) a Positioning Cushion; (ii) a Lumber (sp) Sacral Support; (iii) a Bed Board; (iv) an Egg Crate Mattress; (v) a Cervical Collar; and (vi) a Cervical Pillow; a prescription for the 6-week rental of a SAM Unit and Coupling Patches; and a prescription for the 28-day rental of a Cold Compression Therapy System that were provided to other DME suppliers.  On April 1, 2022, Gaetan Jean Marie, F.N.P. purportedly issued two separate prescriptions to TC that were provided to a different DME supplier; one prescription for: (i) Cervical Traction; and another prescription for (ii) a LSO w/APL Control Custom, despite Jean Marie not performing a follow-up examination or any other service on TC on that day;

(iii)     On February 22, 2022, an Insured named NN was purportedly involved in an automobile accident. Thereafter, NN presented to the Belmont Ave. Clinic.  After an initial examination with Gaetan Jean Marie, F.N.P. on March 4, 2022, Jean Marie purportedly issued a prescription that was provided to a different DME supplier for: (i) a Positioning Cushion; (ii) a Lumber (sp) Sacral Support; (iii) a Bed Board; (iv) an Egg Crate Mattress; (v) a Cervical Collar; (vi) a Cervical Pillow; and (vii) an Orthopedic Car Seat.  On March 10, 2022, Jean Marie purportedly issued a prescription to NN for Fraudulent Equipment that was provided to Vita, despite Jean Marie not diagnosing NN as having any bone fractures, and despite Jean Marie not performing a follow-up examination or any other service on NN on that day;

(iv)     On March 15, 2022, an Insured named EJ was purportedly involved in an automobile accident. Thereafter, EJ presented to the Belmont Ave. Clinic. After an initial examination with Gaetan Jean Marie, F.N.P. on March 29, 2022, Jean Marie purportedly issued two separate prescriptions for DME that were each provided to a different DME supplier; a prescription for: (i) a Positioning Cushion; (ii) a Lumber (sp) Sacral Support; (iii) a Bed Board; (iv) an Egg Crate Mattress; (v) a Cervical Collar; (vi) a Cervical Pillow; and (vii) an Orthopedic Car Seat; and a prescription for the 28-day rental of a Cold Compression Therapy System.  On April 13, 2022, Mishkina Terrane, N.P. purportedly issued a prescription to EJ for Fraudulent Equipment that was provided to Vita, despite neither Jean Marie nor Terrane diagnosing EJ as having any bone fractures, and despite Terrane not performing a follow-up examination or any other service on EJ on that day.  On May 12, 2022, Terrane purportedly issued a prescription to EJ that was provided to a different DME supplier for: (i) a LSO w/APL Control Custom, despite Terrane not performing a follow-up examination or any other service on EJ on that day; and

(v)    On May 18, 2022, an Insured named CA was purportedly involved in an automobile accident. Thereafter, CA presented to the Belmont Ave. Clinic. After an initial examination with Mishkina Terrane, N.P. on May 23, 2022, Terrane purportedly issued three separate prescriptions for DME that were each provided to different DME suppliers; a prescription for: (i) a Positioning Cushion; (ii) a Lumber (sp) Sacral Support; (iii) a Bed Board; (iv) an Egg Crate Mattress; (v) a Cervical Collar; (vi) a Cervical Pillow; and (vii) an Orthopedic Car Seat; a prescription for the rental of a SAM Unit and Coupling Patches; and a prescription for the rental of a Cold Compression Therapy System.  On May 25, 2022, Terrane purportedly issued a prescription for Fraudulent Equipment that was provided to Vita, despite Terrane not diagnosing CA as having any bone fractures, and despite Terrane not performing a follow-up examination or any other service on CA on that day.  Just seven days later, on June 1, 2022, Terrane purportedly issued a <u>second</u> prescription for Fraudulent Equipment that was provided to PRYM, despite Terrane not diagnosing CA as having any bone fractures, and despite Terrane not performing a follow-up examination or any other service on CA on that day.

These are only representative examples.

100.    Additionally -- and again in a legitimate setting -- when a patient is prescribed DME by a healthcare provider, the healthcare provider would indicate in a contemporaneous evaluation report what specific DME was prescribed and why.  Such information is typically included in a contemporaneous report so the healthcare provider can recall what he or she previously prescribed and provide proper follow-up questions during a subsequent evaluation.

101.    In keeping with the fact that the prescriptions for the Fraudulent Equipment provided to Insureds was not medically necessary and provided, to the extent provided at all, pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports written by healthcare providers virtually never made any reference to the Fraudulent Equipment being prescribed, nor was there any information to explain why the healthcare provider was prescribing the Fraudulent Equipment.

102.    Furthermore, and in keeping with the fact that the prescriptions for the Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined

fraudulent protocol, to the extent that Insureds returned for a follow-up examination, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

103.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or adjust the patient's treatment as necessary.

104.    However, the follow-up examination reports from healthcare providers virtually always failed to include any information regarding Fraudulent Equipment prescribed to the Insureds on a prior date.

105.    In further keeping with the fact that the prescriptions for the Fraudulent Equipment identified in Exhibit "1" were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, multiple Insureds involved in the same accident were each prescribed the same Fraudulent Equipment, which was not warranted by their purported soft tissue injuries, to the extent they were even injured at all.  For example:

(i)     On January 11, 2022, three insureds – NR, VDF, and PD – were involved in the same automobile accident. Thereafter, NR, VDF, and PD all received treatment at the Fulton St. Clinic.  NR, VDF, and PD were not diagnosed as having any fractures. Even so, pursuant to the predetermined fraudulent protocol established with the DME Defendants, subsequent to the purported examinations of NR, VDF, and PD on February 23, 2022, Patricia Kelly, D.O. purportedly issued virtually identical prescriptions for Fraudulent Equipment to NR, VDF, and PD that were all provided to VKA.

(ii)    On February 24, 2022, two insureds – BH and PS – were involved in the same automobile accident. Thereafter, BH and PS both received treatment at the Clinic located at 160-59 Rockaway Blvd., Jamaica, New York. BH and PS were not diagnosed as having any fractures. Even so, pursuant to the predetermined fraudulent protocol established with the DME Defendants,

subsequent to the purported examinations of BH and PS on February 28, 2022, Patricia Kelly, D.O. purportedly issued virtually identical prescriptions for the Fraudulent Equipment to BH and PS that were both provided to VKA;

(iii)   On April 25, 2022, three insureds – MG, MR, and MR - were involved in the same automobile accident. Thereafter, MG, MR, and MR all received treatment at the Fulton St. Clinic.  MG, MR, and MR were not diagnosed as having any fractures. Even so, pursuant to the predetermined fraudulent protocol established with the DME Defendants, subsequent to the purported examinations of MG, MR, and MR on April 27, 2022, Levtsenko purportedly issued virtually identical prescriptions for the Fraudulent Equipment to MG, MR, and MR that were all provided to Vita;

(iv)   On May 18, 2022, two insureds – TG and CA – were involved in the same automobile accident. Thereafter, TG and CA both received treatment at the Belmont Ave. Clinic.  TG and CA were not diagnosed as having any fractures. Even so, pursuant to the predetermined fraudulent protocol established with the DME Defendants, subsequent to the purported examinations of TG on May 25, 2022 and CA on June 1, 2022, Mishkina Terrane, N.P. purportedly issued virtually identical prescriptions for the Fraudulent Equipment to TG and CA that were both provided to Vita; and

(v)   On May 25, 2022, three insureds – PM, SD, and AT – were involved in the same automobile accident. Thereafter, PM, SD, and AT all received treatment at the Futon St. Clinic.  PM, SD, and AT were not diagnosed as having any fractures. Even so, pursuant to the predetermined fraudulent protocol established with the DME Defendants, subsequent to the purported examinations of PM, SD, and AT on June 1, 2022, Inna Levtsenko, N.P. purportedly issued virtually identical prescriptions for Fraudulent Equipment to PM, SD, and AT that were all provided to PRYM.

These are only representative examples.

106.   In every claim identified in Exhibit "1", the Fraudulent Equipment was prescribed pursuant to predetermined protocols designed to maximize profits, and not based upon medical necessity.

## III.   The Fraudulent Billing Defendants Submitted or Caused to be Submitted to Liberty Mutual

107.   To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the

Defendants to Liberty Mutual seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

108.    The Defendants' billing forms (*i.e*, NF-3 and/or HCFA-1500 forms) and treatment reports submitted to Liberty Mutual by and on behalf of the DME Providers were false and misleading in the following material respects:

(i)     The billing forms and supporting documentation submitted by and on behalf of the DME Providers uniformly misrepresented to Liberty Mutual that the Fraudulent Equipment was medically necessary. In fact, the Fraudulent Equipment provided, to the extent provided at all, were not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    The billing forms and supporting documentation submitted by and on behalf of the DME Providers uniformly misrepresented to Liberty Mutual that the Defendants operated lawfully in compliance with licensing laws.  In fact, the DME Providers dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements;

(iii)   The billing forms and supporting documentation submitted by and on behalf of the DME Providers uniformly misrepresented to Liberty Mutual that the Defendants operated lawfully in compliance with licensing laws.  In fact, in many instances, the Defendants billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and

(iv)    The billing forms and supporting documentation submitted by and on behalf of the DME Providers uniformly misrepresented to Liberty Mutual that the Defendants billed properly and dispensed equipment that met the requirements of HCPCS Code E0747.  In fact, the bills for the Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as HCPCS codes identified in the bills did not accurately represent what was provided to Insureds.

## IV.    **Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance**

109.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing they submitted, or caused to be submitted, to Liberty Mutual.

110. To induce Liberty Mutual to promptly pay the fraudulent charges for the Fraudulent Equipment, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

111. Specifically, the Defendants knowingly misrepresented and concealed facts related to the DME Providers in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

112. Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

113. Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Fraudulent Equipment were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Equipment.

114. The Defendants also hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers. These law firms routinely filed expensive and time-consuming litigation against Liberty Mutual and other insurers if the charges were not promptly paid in full.

115. The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, are an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the

Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

116.     Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within 30 days. Liberty Mutual takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.

117.     The facially-valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Liberty Mutual to rely upon them. As a result, Liberty Mutual incurred damages of more than $120,086.00 based upon the fraudulent charges for the Fraudulent Equipment.

118.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

119.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

120.     There is an actual case in controversy between Liberty Mutual and the Defendants regarding more than $553,337.00 in pending no-fault insurance billing for the Fraudulent Equipment that has been submitted to Liberty Mutual under the names of the DME Providers (*i.e.*, VKA, Vita, and PRYM).

121.    The DME Providers have no right to receive payment for any pending bills submitted to Liberty Mutual, because the Fraudulent Equipment, to the extent provided at all, were not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

122.    The DME Providers have no right to receive payment for any pending bills submitted to Liberty Mutual because the DME Providers dispensed the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback and financial arrangements.

123.    The DME Providers have no right to receive payment for any pending bills submitted to Liberty Mutual because, in many instances, the Defendants billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions.

124.    The DME Providers have no right to receive payment for any pending bills submitted to Liberty Mutual because the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds, as the HCPCS codes identified in the bills did not accurately represent what was provided to Insureds.

125.    Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the DME Providers have no right to receive payment for any pending bills submitted to Liberty Mutual.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>
**Against All Defendants**
**(Common Law Fraud)**

126.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

127.    VKA, Vita, PRYM, Semenov,  and Varshavskiy intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

128.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary when, in fact, the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that VKA, Vita, and PRYM were properly licensed and acting lawfully and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when, in fact they dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; (iii) in every claim, the representation that VKA, Vita, and PRYM were properly licensed and acting lawfully and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when, in fact, in many instances, they billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and (iv) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when, in fact the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the HCPCS codes identified in the bills did not accurately represent what was provided to Insureds.

129.     VKA, Vita, PRYM, Semenov, and Varshavskiy intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through VKA, Vita, and PRYM that were not compensable under the No-Fault Laws.

130.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,086.00 pursuant to the fraudulent bills submitted by Defendants. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that VKA, Vita, and PRYM submitted, or caused to be submitted, to Liberty Mutual.

131.     VKA, Vita, PRYM, Semenov, and Varshavskiy's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

132.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against All Defendants**
**(Unjust Enrichment)**

133.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

134.     As set forth above, VKA, Vita, PRYM, Semenov, and Varshavskiy have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

135.     When Liberty Mutual paid the bills and charges submitted by or on behalf of VKA, Vita, and PRYM, for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants improper, unlawful, and/or unjust acts.

136.     The Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

137.     The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

138.     By reason of the above, the Defendants' have been unjustly enriched in an amount to be determined at trial, but in no event less than $120,086.00.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against Semenov and Varshavskiy**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

139.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

140.     VKA, Vita, and PRYM together constitute an association-in-fact "enterprise" (the "DME Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

141.     The members of the DME Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, VKA, Vita, and PRYM are independent businesses entities – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to Liberty Mutual.

142.    The DME Fraud Enterprise operates under three separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of Liberty Mutual and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Fraud Enterprise acting singly or without the aid of each other.

143.    The DME Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating various professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Liberty Mutual and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

144.    Semenov and Varshavskiy each has been employed by and/or associated with the DME Fraud Enterprise.

145.    Semenov and Varshavskiy knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that the DME Fraud Enterprise was not eligible to receive under the No-

Fault Laws because: (i) the Fraudulent Equipment, to the extent provided at all, were not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) VKA, Vita, and PRYM dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; (iii) VKA, Vita, and PRYM billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and (iv) the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the HCPCS codes identified in the bills did not accurately represent what was provided to Insureds.  The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

146.    The DME Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Semenov and Varshavskiy operate the DME Fraud Enterprise, inasmuch as the DME Providers never operated  legitimate medical supply companies, and never were eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through VKA, Vita, and PRYM to the present day.

147.    The DME Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to Liberty Mutual and other New

York automobile insurers. These inherently unlawful acts are taken by the DME Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent no-fault billing. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,086.00 pursuant to the fraudulent bills submitted by Semenov and Varshavskiy through the DME Fraud Enterprise.

148.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against Semenov and Varshavskiy**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

149.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

150.    The DME Fraud Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

151.    Semenov and Varshavskiy are employed by and/or associated with the DME Fraud Enterprise.

152.    Semenov and Varshavskiy knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the VKA, Vita, and PRYM were not eligible to receive under the No-Fault Laws because (i) the Fraudulent Equipment, to the extent provided at all, were not medically necessary and was prescribed and dispensed pursuant to

predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) VKA, Vita, and PRYM dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; (iii) VKA, Vita, and PRYM billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and (iv) the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the HCPCS codes identified in the bills did not accurately represent what was provided to Insureds.  The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

153.    Semenov and Varshavskiy knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of fraudulent charges to Liberty Mutual.

154.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,086.00 pursuant to the fraudulent bills submitted by VKA, Vita, and PRYM.

155.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

156.   **WHEREFORE**, Plaintiffs, Liberty Mutual, demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that VKA, Vita, and PRYM have no right to receive payment for any pending bills for the Fraudulent Equipment submitted to Liberty Mutual, amounting to more than $553,337.00;

B.     On the Second Cause of Action against the Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $120,086.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

C.     On the Third Cause of Action against the Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $120,086.00 together punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

D.     On the Fourth Cause of Action against Semenov and Varshavskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $120,086.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and such other and further relief as the Court deems just and proper.

E.     On the Fifth Cause of Action against Semenov and Varshavskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $120,086.00 together punitive damages, costs, interest, and such other and further relief as the Court deems just and proper, together with treble damages, costs, and reasonable attorneys' fees

pursuant to 18 U.S.C. § 1964(c) plus interest; and such other and further relief as the Court deems just and proper.

Dated: December 29, 2022
      Uniondale, New York

                  RIVKIN RADLER LLP

                  By:    *Michael A. Sirignano*
                        Michael A. Sirignano, Esq.
                        Barry I. Levy, Esq.
                        Frank P. Tiscione, Esq.
                  926 RXR Plaza
                  Uniondale, New York 11556
                  (516) 357-3000

                  *Counsel for Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company*